Marvin A. ALLEN, Plaintiff,

v.

CITY OF ATHENS and Doug Gunter, Individually and in his official capacity as Head of the Electrical Department for the City of Athens, Defendants.

CV95–H–1083–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

Sept. 3, 1996.

Candis A. McGowan, Cooper Mitch Crawford Kuykendall & Whatley, Birmingham, AL, for plaintiff.

Jerry L. Batts, Sherrill Batts & Mathews, Athens, AL, for defendants.

## MEMORANDUM OF DECISION

HANCOCK, Senior District Judge.

The Court has before it the February 29, 1996 motion for summary judgment filed by both defendants in this case. Pursuant to the Court's March 1, 1996 and April 1, 1996 Orders, the motion was deemed submitted, without oral argument, on April 9, 1996.

### I. Procedural History

Plaintiff Marvin Allen ("plaintiff") filed this action on April 28, 1995, alleging that defendant City of Athens ("the City") failed to promote him because of his race (African–American), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Plaintiff also asserts a claim under 42 U.S.C. § 1983 against defendant Douglas Gurner ("Gurner"),[1] arising from the same alleged racial discrimination. The Complaint seeks a declaratory judgment, back pay, compensatory and punitive damages, and attorney's fees.

The Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1331 and 1343, since plaintiff's claims arise under the federal civil rights statutes.

Defendants' motion for summary judgment asserts that plaintiff has not only failed to adduce substantial evidence to support his claims, but also that the evidence in the record affirmatively shows that there is no genuine issue of material fact regarding plaintiff's claims.

### II. Standards for Evaluating a Summary Judgment Motion

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. If the evi-

---

1. The style of this case lists "Doug Gunter" as the individual defendant, although it appears that his real name is "Gurner."

dence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2510.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick,* 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property,* 941 F.2d 1428 (11th Cir.1991) *(en banc )).*

■ If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick,* 2 F.3d at 1115. If the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

■ If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. If the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick,* 2 F.3d at 1115–16. The affirmative showing may be accomplished by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories or failure to respond to interrogatories; requests for admission and responses thereto; and other exchanges between the parties that are in the record. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir.1991); *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

### III. Undisputed Relevant Facts

The record reveals the following undisputed facts. Plaintiff began working for the City in 1988 as a laborer in the Streets and Sanitation Department. (Allen Depo. at 15). He worked in this position until 1993, at which time he was promoted to the position of Crew Chief in the Streets and Sanitation Department. (Allen Depo. at 16).

When City positions become open, the City follows a procedure of giving preference to existing City employees. (Kelly Depo., Vol. I, at 19). The City's written policy is that "[w]henever practical, the City will fill vacant classified positions by promotion of City employees who meet required qualifications and have demonstrated potential before recruiting from outside sources." *(Id.* at 26–27). Pursuant to this policy, when a job opening becomes available, the City first advertises it internally, giving existing City employees five days to apply. *(Id.* at 15, 21). These applications are sent directly to the Department Head making the hiring decision. *(Id.* at 18, 21). If the Department Head desires more applicants than those received in-house, he informs the City's Human Resources Director, Kay Bentley Kelly, who advertises the position publicly. *(Id.* at 11, 22). After ten days have passed for outside persons to apply, Kelly screens the applications, selecting the most qualified for review by the Department Head. *(Id.* at 18, 28, 47).

The City's job description for the lineman apprentice position, the position that plaintiff claims he did not receive because of discrimination, includes twenty-two job requirements. (Kelly Depo., Vol. I, at 32). Fourteen of these requirements are taught on the job, (*Id.* at 33); the eight requirements that are not taught on the job are (1) verbal skills to communicate with co-workers and supervisors, (2) writing skills to complete routine forms, (3) reading skills to read and understand work orders, other instructions, electric lineman learner manuals, rules, policies, procedures, and safety manuals, (4) skills in basic math to frame poles and measure wire, (5) ability to climb and handle oneself on a pole, (6) knowledge to read staking sheets and to perform work, (7) ability to follow oral and written instructions, and (8) ability to supervise lower-grade apprentices and helpers. (Kelly Depo., Exhibit 1, Bates # 1009). The job description recites that the lineman apprentice

> [p]erforms electrical line work and manual labor duties in learning the lineman trade. Assists linemen in the construction, repair and maintenance of power lines. Performs pole climbing, handling live wires, installing hardware, digging holes and other manual duties related to electrical line work. Operates bucket truck, line truck, chain saw, air compressor, ditch witch and other equipment in construction and maintenance of power lines.

(*Id.*, Bates # 1008).

When a lineman apprentice position becomes open, the City follows the procedure outlined above for advertising the position internally, collecting internal applications, and giving Doug Gurner, the Head of the City's Electrical Department, the option of advertising for outside applications. (See above record citations). The persons whose applications are forwarded to Gurner are given a written lineman trainee selection test, which measures basic math and reading comprehension skills. (Gurner Depo. at 44).

The applicants are then given a physical test, which involves climbing a ladder, walking on a balance beam, standing on a pole and hooks, and performing various operations. (*Id.* at 42). The foremen, who administer the test, make recommendations to the general foreman, who communicates the recommendations to Gurner. (*Id.* at 54). Gurner then makes his selection to fill the position, and makes a recommendation to the Head of the City's Utilities Department. (*Id.*). The Head of the Utilities Department then makes a recommendation to the City's Mayor, who makes the ultimate decision to hire. (*Id.* at 15, 54).

Plaintiff applied for an open lineman apprentice position in August 1993. (Kelly Depo., Vol. II, at 9). Plaintiff was the only in-house applicant for that position. (*Id.*). Plaintiff had previously applied for the same position in April 1993, and had taken the written and physical tests in conjunction with that application. (Gurner Depo. at 72). When plaintiff's August 1993 application was received by the Electrical Department, his earlier test results were reviewed a second time by the foremen and general foreman, who recommended that the position be publicly advertised. (*Id.* at 68). Gurner concurred in this recommendation, and asked Kelly to advertise the position. (*Id.* at 72; Kelly Depo., Vol. II, at 11). The position was advertised from September 10–20, 1993, and the City received fifty-nine outside applications. (Defendant's Answers to Interrogatories, # 3). Nine applicants, including plaintiff, were considered for the position. (*Id.*).[2] All nine applicants passed the physical test, and plaintiff ranked eighth out of the nine applicants on the written test. (*Id.*, # 8).[3]

Two of the nine applicants were hired, Heith Embry and Jason White (both caucasians). (Gurner Depo. at 65). Embry's application showed construction and climbing experience, as well as experience as a cable television company technician. (Defendant's

---

**2.** The parties appear to disagree on the point of whether plaintiff was *interviewed* for this position. Defendants contend that he was, while plaintiff asserts that he was not. This factual dispute, however, is irrelevant to the resolution of the instant motion.

**3.** Plaintiff's score was 14/26; the other applicants' scores were 21/26 (three applicants), 24/26 (two applicants), 25/26, 26/26, and 6/26. (Defendant's Answers to Interrogatories, # 8).

Answers to Interrogatories, # 2 (attached application of Embry)). He had graduated from high school, and had taken a number of college-level courses in industrial electronics. (*Id.*). Embry's score on the City's written lineman apprentice test was 21/26. (*Id.,* # 8).

Jason White, the other applicant hired, also had prior experience as a cable television technician. (Kelly Depo., Exhibit 4). He specifically listed pole climbing as one of the activities he had experience in. (*Id.*). He stated that his prior experience included "safety near electricity," "usage of hard hats and other lineman equipment, including voltage, ohm, and field test meters." (*Id.*). White's score on the written test was 25/26. (Defendant's Answers to Interrogatories, # 8).

Plaintiff applied once again for a lineman apprentice position in November 1993. (Defendant's Answers to Interrogatories, # 4). His application was again sent directly to the Electrical Department. (Kelly Depo., Vol. II, at 35).[4] After reviewing the in-house application(s), the Electrical Department again decided to advertise the opening publicly. (*Id.*). The advertisement drew 61 outside applications. (*Id.*). Six applicants were considered for the position, including plaintiff. (Defendant's Answers to Interrogatories, # 4). Gurner and the City gave the position to Mark Prestridge, who had previously worked for the City as a lineman apprentice in 1991. (Gurner Depo. at 73). Because Prestridge had finished approximately three-quarters of the City's lineman apprentice program in 1991, he had experience in pole climbing, sagging wire, making up weatherheads, operating line trucks, hooking up transformers on single-phase lines, and splicing wire. (Kelly Depo., Exhibit 5). Prestridge's 1991 written and physical test scores were used in evaluating his application; he had passed the physical test and had

scored a 20/26 on the written test. (Gurner Depo. at 73; Defendant's Answers to Interrogatories, # 8).

Plaintiff applied again for an open lineman apprentice position in December 1993. (Gurner Depo. at 78). Gurner testified that, at this time, he asked Johnny Pryor, the Electrical Department's new African–American general foreman, to give plaintiff's application "a close look." (*Id.* at 83). Plaintiff also re-took the written test in December 1993, again scoring a 14/26. (Kelly Depo., Exhibit 1, Bates # 1213–1221). Allen was not recommended for the position by the foremen and general foreman, (Gurner Depo. at 83–84), but the parties have not directed the Court's attention to information in the record concerning the qualifications of the individuals who were selected in December 1993.

Plaintiff has had no experience in the electrical field, and has taken no vocational classes since high school. (Allen Depo. at 10–15). He had previously applied for a lineman apprentice position in 1989, and believed at the time that he was not the most qualified person for the job. (*Id.* at 33). Plaintiff took no action to improve his skills or qualifications between 1989 and 1993. (*Id.* at 35).[5] Plaintiff's May 1993 and August 1993 applications for the lineman apprentice position indicated that he had "no special skill in this field," but that he was "willing and eager to learn." (Allen Depo., Exhibits 4 and 5).

Plaintiff's performance reviews from his positions in the City's Sanitation Department were good—he received scores of 3/5 (indicating "fully meets job requirements"), and his supervisor's comments were positive. (Kelly Depo., Exhibit 1, Bates # 1029–38, 1045–46). The City's Human Resources Department had never received any complaints about plaintiff's abilities or performance. (Kelly Depo., Vol. I, at 108, 121; Vol. II, at 6). His supervisor indicated in two separate

---

**4.** The parties have another minor factual dispute with respect to plaintiff's November 1993 application. Defendant claims that there were two in-house applications at that time, while plaintiff claims that he was the only in-house applicant. The peripheral nature of this disputed fact makes it irrelevant to the motion for summary judgment.

**5.** Plaintiff's Brief in Opposition to Summary Judgment suggests that he did acquire experience in pole climbing by taking the physical portion of the City's lineman apprentice test several times. The Court understands the term "experience" to mean on-the-job experience.

evaluations that plaintiff had "the knowledge, skills, abilities, and other qualifications needed for successful job performance" of his duties in the Sanitation Department. (Kelly Depo., Exhibit 1, Bates # 1029–38, 1045–46).

The "knowledge and skills" required for plaintiff's crew chief position overlap substantially with the requirements for the lineman apprentice position that are not taught on the job. (Kelly Depo., Exhibit 1, Bates # 1009, 1040).[6] The lineman apprentice position required skills of basic math and pole climbing ability, which were not skills required for the Sanitation Department crew chief position. (*Id.*).

The parties have also both cited to evidence in the record to indicate the numbers of African–American employees in various City departments, and the City's history of hiring black applicants. Plaintiff asserts that, of 283 City employees, only 45 are black; of 40 Electrical Department employees, only four are black. (Kelly Depo., Vol. I, at 64, 79; Gurner Depo. at 95). Of the 40–45 employees in the Sanitation Department, 14 are African–American. Defendant directs the Court's attention to evidence in the record that several black applicants and in-house employees were hired as foremen, linemen or linemen apprentices. (Kelly Depo., Vol. II, at 41–45; Gurner Depo. at 24–25, 27–28, 31). Plaintiff points out Gurner's testimony that one of the black applicants hired as a lineman apprentice, Wayne Tisdale, was hired by Gurner in part to forestall charges of racial discrimination. (Gurner Depo. at 32–33, 38 (Gurner testifies that he hired a black applicant to avoid a potential lawsuit: "I think they call it affirmative action.")).

Plaintiff also heavily relies on Gurner's testimony that he has told racial jokes and used the "N" word within the last ten years.

The portion of Gurner's deposition testimony cited by plaintiff reads as follows:

Q. Have you ever made any racial jokes in the last ten years?

A. Yes.

Q. Have you ever used the "N" word in the last ten years?

A. Yes.

Q. Do you recall the last time?

\*　　\*　　\*　　\*　　\*　　\*

A. I couldn't tell you.

\*　　\*　　\*　　\*　　\*　　\*

Q. Do you recall when was the last time you told a racial joke?

A. No.

Q. Has it been within the last year?

A. Certainly, yes.

(Gurner Depo. at 100–01). Plaintiff also points out that Gurner, in his deposition, referred to Carlos Kennemer, one of his foremen, as "the black guy." (Gurner Depo. at 77–78).[7] Plaintiff testified that Gurner refused to shake his hand when he was considered for the lineman apprentice position on several occasions, although Gurner shook the hands of the other (white) applicants: according to plaintiff, Gurner would "shake the other fellows' hand. He looked at me like to say, there you are again, Mr. Allen, you know." (Allen Depo. at 83–84).

## IV. Applicable Substantive Law and Analysis

■ Plaintiff asserts a claim against the City under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), and against Gurner under 42 U.S.C. § 1983. Plaintiff seeks relief under § 1983 from Gurner both individually and in his official capacity as the Head of the City's Electrical Department.[8]

---

6. Both jobs require verbal skills to communicate with co-workers and supervisors, writing skills to complete routine forms, reading skills, and ability to follow instructions.

7. Kennemer was originally a City employee in the Sanitation Department who was hired as a lineman apprentice in 1989. (Gurner Depo. at 29). Kennemer was promoted to the position of lineman in 1993, and was later promoted to the position of lineman foreman. (Kelly Depo., Vol. II, at 41–42, 43–44).

8. The City can only be held liable under § 1983 for Gurner's conduct "in his official capacity" if Gurner possessed "final policymaking authority" with respect to the issue in question. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). While the Court doubts that Gurner possessed such authority, it will assume that he did for the purpose of evaluating the present motion.

As an initial matter, the Court notes that claims of disparate treatment under both Title VII and § 1983 have the same elements. *See Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805 (11th Cir.1995). Title VII and § 1983 race discrimination claims are analyzed using "[i]dentical methods of proof"; the *McDonnell Douglas* approach to analyzing circumstantial evidence of discrimination is applied in Title VII and § 1983 cases alike. *Id.* So, the Court will discuss plaintiff's Title VII claims and § 1983 claims together.

■ A plaintiff alleging disparate treatment may prove a prima facie case either through "direct evidence" of discrimination or with circumstantial evidence. *Burns v. Gadsden State Comm. College,* 908 F.2d 1512, 1517–18 (11th Cir.1990). Circumstantial evidence is analyzed under the rubric of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, the *McDonnell Douglas* analysis is not used to evaluate claims based on direct evidence. *See Burns,* 908 F.2d at 1518. Because plaintiff here claims that his case is supported by both direct and circumstantial evidence, the Court will address each method of proof separately.

### A. Direct Evidence

■ "Direct evidence of discrimination would be evidence, which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). Direct evidence often takes the form of remarks made by employers that reveal discriminatory attitudes and that are related to the challenged employment decision. *See, e.g., Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 930–31 (11th Cir.1995) (statement by decisionmaker that women were unfit for the job plaintiff was rejected for constituted direct evidence); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 873–74 (11th Cir.1985) (racial slur made by supervisor concerning blacks' work abilities constituted direct evidence). However, not every remark made in the workplace constitutes direct evidence of discrimination.

Justice O'Connor defined "direct evidence" as follows:

> [t]hus, stray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.

*Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) (citations omitted). The Eleventh Circuit has adopted Justice O'Connor's definition of direct evidence. *See Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1453–55 (11th Cir.1996); *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990).

Because plaintiff here argues that he has such direct evidence, it is important, as a threshold matter, for the Court to determine what effect direct evidence has in a discrimination case. The distinction between direct and circumstantial evidence permeates the Eleventh Circuit's Title VII cases. The distinction was further reinforced by the Supreme Court in *Price Waterhouse,* which itself was then overruled (in part) by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m). Determining the significance of direct evidence in the wake of these recent changes in the law will require the Court to digress briefly into the history of the distinction between direct and circumstantial evidence, followed by a discussion of the effect of the Civil Rights Act of 1991.

Prior to 1991, *Price Waterhouse* made it clear that a claim of discrimination under Title VII involved proof of two distinct elements: (1) a discriminatory intent or animus that, in some way, related to the employer's decision-making process, and (2) a cause-in-fact element, or proof that the challenged employment decision would have been different absent discrimination. *See Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. at 1786 (plurality opinion). Under *Price Waterhouse* and the line of Eleventh Circuit cases that existed before it, a plaintiff making a Title

VII claim based on circumstantial evidence bore the burden of proof on both of these elements, and could recover only if both were satisfied. *See Price Waterhouse*, 490 U.S. at 270–73, 109 S.Ct. at 1801–03 (O'Connor, J., concurring).

However, the Eleventh Circuit had concluded, along with many other Courts of Appeal, that direct evidence changed the burdens of proof. When a Title VII plaintiff presented direct evidence of discriminatory intent that was related to the challenged employment decision and that was believed by the trier of fact, the trier of fact was *required to conclude* that the second element—cause in fact—was established. This conclusion would stand unless the defendant bore its burden of proof that it would have made the same decision, even absent consideration of the impermissible factor. *See, e.g., Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir.1985). The Supreme Court reached the same result in *Price Waterhouse. See Price Waterhouse*, 490 U.S. at 278–79, 109 S.Ct. at 1805–06 (O'Connor, J., concurring).

Pre–1991 law regarded the causation inquiry as an essential element to proving a violation of Title VII. Under *Price Waterhouse*, if the defendant succeeded in disproving causation, the effect was a finding of no liability at all. *Id. See also Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518 (11th Cir.1990) (the defendant could "avoid liability" if it carried its burden).

However, Congress was dissatisfied with the strict causation requirement represented by *Price Waterhouse.* In 1991, Congress amended Title VII to add two new subsections that are pertinent here. First, Congress eliminated cause-in-fact as an essential element of a Title VII claim:

> [e]xcept as otherwise provided in this subchapter, an unlawful employment practice

is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m). Contrary to the result reached in *Price Waterhouse,* § 2000e–2(m) requires a finding of liability when the discriminatory intent is only one "motivating factor" in the challenged employment decision. However, the *Price Waterhouse* burden-shifting approach also survived, in modified form:

> [o]n a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—
>
> > (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and
> >
> > (ii) shall not award damages, or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e–5(g)(2)(B).

Sections 2000e–2(m) and 2000e–5(g)(2)(B), read together, make it clear that if the plaintiff convinces the trier of fact that discriminatory animus influenced the employer's decision, the burden then shifts to the defendant to disprove causation, just as in *Price Waterhouse.* However, the effect of the employer's success in meeting that shifted burden is different from that described in *Price Waterhouse.* Instead of a judgment of no liability at all, the defendant's proof of "no causation" serves only to limit its liability to the kinds of relief specified in § 2000e–5(g)(2)(B).[9]

---

**9.** The Court believes that the best way to deal with these shifting burdens of proof in a jury trial is to submit a special verdict form or special interrogatories to the jury under Fed.R.Civ.P. 49. First, the jury should answer the question of whether the plaintiff has carried his burden of proving that the employer had a discriminatory intent that was a "motivating factor" in the challenged employment decision. Then, if the an-

swer to that question is affirmative, the jury should answer whether the defendant has carried its burden of showing that the decision would have been the same, even absent discrimination. If the jury answers "yes" to both questions, it would then be proper for the *court*, not the jury, to determine the relief due the plaintiff under § 2000e–5(g)(2)(B). That section specifically requires "the court" to grant relief, and the types

The more interesting question raised by the 1991 Civil Rights Act is whether §§ 2000e–2(m) and 2000e–5(g)(2)(B) have erased the distinction between direct and circumstantial evidence. The Eleventh Circuit has not yet addressed this issue, but the courts that have reached it have come to differing conclusions. In *Fuller v. Phipps*, 67 F.3d 1137 (4th Cir.1995), the Fourth Circuit held that §§ 2000e–2(m) and 2000e–5(g)(2)(B) only applied in direct evidence cases, and so concluded that the traditional distinction between direct and circumstantial evidence survived the 1991 Act. *Id.* at 1143–44. The Fourth Circuit relied upon a comment in dicta in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), reciting that § 2000e–2(m) was designed to apply in "mixed motive" cases. *See Landgraf*, at ———, 114 S.Ct. at 1489–90. In addition, the Fourth Circuit cited the language of § 2000e–2(m), which it held specifically contemplated a "mixed motive" case. *Fuller*, 67 F.3d at 1143–44. Finally, the court noted the legislative history of the 1991 Act, which, in its opinion, "makes [it] evident that Congress sought to alter the standards of liability in mixed-motive cases." *Id.* at 1144.[10] Treating the category of "mixed motive" cases as synonymous with "direct evidence" cases, the Fourth Circuit concluded that § 2000e–2(m) only applied when the plaintiff produces direct evidence. *See also Smith v. F.W. Morse & Co.*, 76 F.3d 413, 420–22 (1st Cir.1996) (assuming that the distinction between direct and circumstantial evidence survived the 1991 Act, but praising a district court for ignoring the distinction).

However, the Fourth Circuit's conclusion about the scope of §§ 2000e–2(m) and 2000e–5(g)(2)(B) is open to question. The language of § 2000e–2(m) speaks in plain, unambiguous terms, and makes no distinction between direct and circumstantial evidence. All that is required to trigger liability under § 2000e–2(m) is that the plaintiff "demonstrate" that discrimination was a "motivating factor" in the challenged employment decision. Whether the plaintiff proves that critical fact through direct or circumstantial evidence is not a factor the plain language of the statute takes into account.

■ And, given the clarity of § 2000e–2(m), its legislative history should be irrelevant to its interpretation. *See Pedigo v. P.A.M. Transport, Inc.*, 60 F.3d 1300, 1302 (8th Cir.1995) (finding the language of § 2000e–2(m) unambiguous and refusing to consider legislative history). Recent Supreme Court decisions have repeatedly instructed lower courts to refrain from using legislative history to alter or contradict plain statutory pronouncements. *See, e.g., Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). The legislative history might support an argument that § 2000e–2(m) applies only in direct evidence cases, but § 2000e–2(m)'s language is not so limited. When the statute and legislative history disagree, the statute controls. *See, e.g., West Virginia Univ. Hosps. v. Casey*, 499 U.S. 83, 97–101, 111 S.Ct. 1138, 1146–48, 113 L.Ed.2d 68 (1991); *In re Sinclair*, 870 F.2d 1340, 1341–44 (7th Cir.1989).

Faced with the language of § 2000e–2(m), a number of courts have concluded that § 2000e–2(m) applies to both direct and circumstantial evidence cases. *See Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350–51 (7th Cir.1995) (affirming jury instructions that applied § 2000e–2(m) to a case with both direct and circumstantial evidence: "whether ... sex was a motivating factor in [the] decision to fire [plaintiff] was the ultimate issue"); *Salter v. Douglas MacArthur State Tech. Coll.*, 929 F.Supp. 1470, 1475, 1477 n. 34 (M.D.Ala.1996) (applying § 2000e–2(m), even though the plaintiff did not attempt to prove discrimination through direct evidence); *Hearn v. General Electric Co.*, 927 F.Supp. 1486, 1497–99 (M.D.Ala.

---

of relief involved (attorney's fees and injunctive and declaratory relief) are traditionally granted by a court, not a jury.

**10.** The 1991 Act's legislative history recites that the purpose of § 2000e–2(m) was to restore the law as it existed in a majority of the circuits prior

to *Price Waterhouse*, and a House Report discusses the types of direct evidence that might qualify to invoke § 2000e–2(m). *See* H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 45, 48–49, reprinted in 1991 U.S.C.C.A.N. 549, 583, 586–87.

1996) (discussing the conflict between the Eleventh Circuit's direct evidence cases and § 2000e–2(m)).

The Fourth Circuit's citation to *Landgraf* is also unpersuasive. In *Landgraf*, the Supreme Court held that the 1991 Civil Rights Act did not apply retroactively. *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1508. In discussing the 1991 Act, the Supreme Court made the following comment about § 2000e–2(m): "§ 107 responds to *Price Waterhouse v. Hopkins*, by setting forth standards applicable in 'mixed motive' cases." *See Landgraf*, at —— – ——, 114 S.Ct. at 1489–90 (citation omitted). The Fourth Circuit interpreted this comment in dicta to mean that § 2000e–2(m) only applied in direct evidence cases. However, this Court does not accept the Fourth Circuit's premise that the term "mixed motive" is synonymous with "direct evidence." An employer can have "mixed motives" even when the plaintiff proves his case through circumstantial evidence.

The term "mixed motive" was born from the Supreme Court's decision in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Mt. Healthy* involved a state-employed teacher who had been fired for two stated reasons: (1) his public complaints to a local radio station about school policies, and (2) other inappropriate conduct at school, such as the use of obscene gestures toward students. *Id.* at 283 n. 1, 97 S.Ct. at 574 n. 1. The teacher sued under § 1983, claiming that his discharge was motivated (at least in part) by retaliation for engaging in speech protected by the First Amendment. *Id.* at 276, 97 S.Ct. at 570. The Court concluded that, once the plaintiff showed that his speech was protected and was a "motivating factor" in the defendant's decision, the burden shifted to the defendant to prove that it would have made the same decision absent the consideration of the plaintiff's complaints to the media. *Id.* at 287, 97 S.Ct. at 576.

Nowhere in *Mt. Healthy* did the Supreme Court mention any distinction between direct and circumstantial evidence, although there was direct evidence present (in the form of a letter from the defendant to the plaintiff). And, subsequent discussions of *Mt. Healthy* by the Supreme Court also fail to place any emphasis on the difference between direct and circumstantial evidence. *See McKennon v. Nashville Banner Pub. Co.*, —— U.S. ——, ——, 115 S.Ct. 879, 885, 130 L.Ed.2d 852 (1995). In fact, in *McKennon*, the Court described a "mixed motive" case as one "in which two motives were said to be operative in the employer's decision to fire an employee." *Id.* In addition, instead of emphasizing the direct evidence present in *Mt. Healthy*, the Court noted that the holding in *Mt. Healthy* was "controlled by the difficulty, and what we thought was the lack of necessity, of disentangling the proper motive from the improper one where both played a part in the termination and the former motive would suffice to sustain the employer's action." *Id.*

Viewed in light of *Mt. Healthy*, the term "mixed motive" denotes exactly what it says—a case where the employer's decision is based on mixed proper and improper motives. The conclusion that the term is synonymous with "direct evidence" is not supported by either the language of § 2000e–2(m) or the holding in *Mt. Healthy*. In fact, the only Supreme Court case that ever emphasized the distinction between direct and circumstantial evidence, *Price Waterhouse*, was overruled by § 2000e–2(m), which recognizes no such distinction.

For these reasons, the Court concludes that the 1991 Civil Rights Act has abolished the distinction between direct and circumstantial evidence at the trial stage of Title VII litigation. However, one small analytical difference remains between direct and circumstantial evidence in resolving a motion for summary judgment.

As noted above, the *McDonnell Douglas/Burdine* approach does not apply to direct evidence cases. *Burns v. Gadsden State Comm. College*, 908 F.2d 1512, 1518 (11th Cir.1990). The reason for this limited distinction is obvious: "the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271, 109 S.Ct. 1775, 1801, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). So, at the summary judgment stage, a court should

analyze circumstantial evidence under the *McDonnell Douglas* framework, while evaluating direct evidence under the general standards of Rule 56. If a plaintiff is able to produce true direct evidence in opposition to a motion for summary judgment, summary judgment would seldom be proper.

 That discussion aside, the Court can turn to an evaluation of plaintiff's purported direct evidence in this case. Plaintiff cites the following evidence in the record as "direct evidence": (1) Gurner's testimony that he has hired black and female applicants to avoid claims of race and sex discrimination; (2) Gurner's reference to Carlos Kennemer as "the black guy"; (3) Gurner's admission of telling racial jokes and using the "N" word; (4) Kelly's admission to the same effect; and (5) plaintiff's testimony that Gurner would not shake his hand when he was being evaluated for the lineman apprentice position.

Before addressing each of these items of evidence, the Court reiterates that direct evidence of discrimination is rare indeed. Justice O'Connor's opinion in *Price Waterhouse* emphasized that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are not direct evidence. *See Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J., concurring). The Eleventh Circuit, along with most of the other circuits, has adopted this narrow view of what constitutes direct evidence. *See Trotter v. Board of Trustees of the University of Alabama,* 91 F.3d 1449, 1453–55 (11th Cir.1996); *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir. 1993) ("Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence."); *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990); *Tomsic v. State Farm Mut. Auto. Ins. Co.,* 85 F.3d 1472, 1477–78 (10th Cir.1996) (statements of personal opinion by supervisor about married woman's motivation to work were not direct evidence); *Kriss v. Sprint Communications Co.,* 58 F.3d 1276, 1282 (8th Cir.1995) (adopting Justice O'Connor's definition of direct evidence); *O'Connor*

*v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 548–49 (4th Cir.1995) ("Unless the remarks on which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge."); *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) ("isolated and ambiguous statements," even when made by decision-maker, did not constitute direct evidence).

With this strict standard in mind, the Court now turns to the five pieces of evidence relied upon by plaintiff. The first item of purported direct evidence is Gurner's testimony that he had hired one black applicant and one female applicant in order to avoid discrimination lawsuits; he testified that "I think they call it affirmative action." (Gurner Depo. at 33–34, 38–39). This evidence is far too equivocal to be direct evidence. Possibly, Gurner's testimony shows that he was aware that he had been discriminating on the basis of race and sex, and hired a woman and a black applicant to compensate for this. On the other hand, Gurner's testimony might simply indicate that he feared discrimination lawsuits, even those without merit, and sought to demonstrate his fairness toward black and female applicants. The fact that either of these two inferences could be drawn from this evidence shows that Gurner's testimony is too ambiguous to qualify as direct evidence. *See also Bashara v. Black Hills Corp.,* 26 F.3d 820, 824 (8th Cir.1994) (holding that employer's expressed concern about the possibility of litigation was "a natural reaction to the ever-present threat of litigation," and so was not direct evidence). In addition, the incidents of Gurner's "affirmative action" were not related in any way to Gurner's decision not to hire plaintiff.[11] Since "statements by decisionmakers unrelated to the decisional process itself" are not direct evidence, Gurner's testimony cannot satisfy plaintiff's burden of making out a prima facie case.

 The second piece of evidence plaintiff relies on is Gurner's reference to Carlos Kennemer, a black foreman in the

---

11. The parties have not cited the Court to any information in the record concerning the time frame in which these "affirmative action" decisions were made by Gurner; it is entirely possible that they were separated from the decisions regarding plaintiff by a significant period of time.

Electric Department, as "the black guy." (Gurner Depo. at 77–78). Gurner's comment in his deposition can be interpreted in only one way—he was identifying Kennemer because Kennemer was the only black foreman under Gurner's supervision. Gurner's comment was a response to a question from plaintiff's counsel asking Gurner to identify all of his foremen by name *and race*. Viewed in this light, Gurner's comment has no probative value in showing any discriminatory attitude by Gurner. Remarks by a supervisor must be clearly discriminatory and must be related to the challenged employment decision to constitute direct evidence. Gurner's reference to Kennemer as "the black guy" is neither.

▮▮ The third piece of evidence proffered by plaintiff is Gurner's deposition testimony that he had told racial jokes and used the "N" word within the past ten years, and had told racial jokes within the last year. (Gurner Depo. at 100–01). Again, this testimony fails to qualify as direct evidence because of its lack of relation to Gurner's decision not to hire plaintiff. Significantly, the record does not reveal that Gurner ever made derogatory racial remarks about plaintiff. In addition, the evidence reveals that Gurner's remarks may have been separated from the decision not to hire plaintiff by as much as ten years (the "N" word) or one year (racial jokes). Comments by a supervisor that are temporally remote from the challenged decision can hardly be direct evidence of discrimination, since they require an inference of a general discriminatory attitude, followed by another inference that the attitude entered into the making of the challenged decision. *See Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir.1994). Here, the remarks were both temporally remote and were wholly unrelated to either the decision not to hire plaintiff or the general hiring standards and policies Gurner had developed for choosing lineman apprentices. The evidence does not even indicate that Gurner's comments were made at work or with regard to work. Thus, they cannot constitute direct evidence.

▮▮ The fourth item of alleged direct evidence offered by plaintiff is the testimony of Kay Kelly, the City's Human Resources Director, that Kelly has "probably" told jokes about minorities within the past ten years and "may have" used the "N" word within the same time frame. (Kelly Depo., Vol. II., at 75). In addition to the problems noted above with respect to Gurner's similar admissions, Kelly's testimony fails to qualify as direct evidence because Kelly was not a decisionmaker with respect to plaintiff. The undisputed evidence in the record is that Gurner came to a decision, and then made a recommendation to his superiors, who had the ultimate authority to hire. Because Kelly played no decisionmaking role regarding whether plaintiff would be hired as a lineman apprentice, her remarks cannot constitute direct evidence. *See Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1454 (11th Cir.1996).

▮▮ Finally, plaintiff offers his own testimony that Gurner refused to shake his hand when he met the lineman apprentice applicants, although Gurner shook the hands of the other (presumably white) applicants. According to plaintiff, Gurner would "shake the other fellows' hand. He looked at me like to say, there you are again, Mr. Allen, you know." (Allen Depo. at 83–84). This incident could be deemed "related" to the decision not to hire plaintiff, since it occurred at the time that Gurner was making the challenged decision. However, the evidence is far too equivocal to qualify as direct evidence. Gurner could have had any of a number of reasons for treating plaintiff in this fashion; his behavior could be an indication of his personal dislike of plaintiff, his disdain for plaintiff's repeated attempts to apply for a job that Gurner felt he was unqualified for, or something else. Even plaintiff's testimony about Gurner's motivation suggests this explanation—plaintiff believed that Gurner's thought was "there you are again, Mr. Allen." Whatever Gurner was thinking, his conduct is much too ambiguous to suggest discrimination without inference. Therefore, it is not direct evidence.

So, the Court concludes that none of the evidence offered by plaintiff constitutes direct evidence that would serve to make out a prima facie case of intentional discrimination.

Accordingly, the Court will now proceed to a *McDonnell Douglas* analysis of the evidence.

### B. Circumstantial Evidence— McDonnell Douglas

When a plaintiff relies on circumstantial evidence to establish a case of discrimination, the court's analysis of the evidence should proceed in three steps. Initially, the plaintiff has the burden of establishing a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the plaintiff does so, a presumption of discrimination arises, and the burden shifts to the defendant to produce—but not prove—a "legitimate, non-discriminatory reason" for its decision. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If the defendant does so, the presumption of discrimination that arose from the prima facie case disappears, and the burden of proof is left with the plaintiff to show that the employer acted with a discriminatory intent and that its proffered explanation was a pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir.1994).

In order to make out a prima facie case under *McDonnell Douglas*, a plaintiff must show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applications from persons of complainant's qualifications." *Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1093 n. 6, quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The plaintiff's burden in establishing a prima facie case is "not onerous." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

Here, the only argument made by defendants is that plaintiff was not qualified for the lineman apprentice position.[12] Defendants argue that Allen lacked the pole climbing ability and the basic math skills required by the City's job description. (Kelly Depo. Vol. II, Exhibit 1, Bates #1009). However, plaintiff has presented evidence that he passed the physical pole-climbing test administered by the City, and his scores on the written math test (14/26 both times) were higher than that made by one other individual who was hired for the same position. (Gurner Depo. at 47–49). So, the Court will assume, without deciding, that plaintiff was minimally qualified for the position, and therefore assume that he has made out a *McDonnell Douglas* prima facie case.[13]

A plaintiff's satisfaction of the *McDonnell Douglas* prima facie case, however, does not necessarily entitle him to present his case to a jury. *Burdine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7. The defendant next has the opportunity to rebut the presumption of discrimination created by the prima facie case by producing evidence of a legitimate, nondiscriminatory reason for the challenged action. *Id.* at 254, 101 S.Ct. at 1094. The defendant need not convince the court that its reasons were legitimate; its burden is one of production only, and has been characterized by the Eleventh Circuit as "exceedingly

---

12. Defendants admit that plaintiff belongs to a racial minority group (African–American). In addition, the undisputed evidence in the record indicates that plaintiff applied for the lineman apprentice position, was rejected, and the position was filled by white applicants.

13. In making this assumption, the Court wishes to note that it has serious doubts as to whether plaintiff was actually qualified for the position. Plaintiff's lack of pole climbing experience may not have rendered him unqualified, since he passed the City's physical test, but his low score on the written basic math test seems to indicate that he was not qualified. Gurner testified that the "bare minimum" score an applicant could

make to be hired was 16 or 17, and most new hires in the position scored above 20. (Gurner Depo. at 47–49). This testimony is corroborated by the fact that the three applicants who were hired over plaintiff scored 20/26, 21/26 and 25/26 on the written test. (Defendant's Answers to Interrogatories, #8). Gurner testified that the single individual who scored lower than plaintiff was hired in 1989 or 1990, and the quality of applicants for the lineman apprentice positions had improved between then and 1993. (Gurner Depo. at 47–49). Thus, according to Gurner, the minimum acceptable score had been increased by the time plaintiff applied for the position. (*Id.*).

light." *See Walker v. NationsBank*, 53 F.3d 1548, 1556 (11th Cir.1994).

Here, it is beyond doubt that defendants have met this burden of production. The undisputed evidence in the record shows that, on both occasions when defendants rejected plaintiff in favor of other applicants, those other applicants were more qualified than plaintiff for the position. Heith Embry and Jason White, the applicants chosen for the August 1993 opening, both scored significantly higher than plaintiff on the written math test. (Defendant's Answers to Interrogatories, # 8). In addition, both had pole-climbing experience from their prior work as cable technicians. (Defendant's Answers to Interrogatories, # 2 (attached application of Embry); Kelly Depo., Exhibit 4 (application of White)). Embry had significant post-high school education in industrial electronics, while White had substantial experience with safety procedures around electricity and with the operation of various equipment used by lineman apprentices. (*Id.*). Gurner testified that he hired these individuals because they were more qualified, (Gurner Depo. at 66–67), and the evidence in the record certainly permits this explanation.

Similarly, the November 1993 opening was filled by an individual with apparently superior qualifications to plaintiff's. Mark Prestridge also scored much higher than plaintiff on the written test, and had previously worked for the City as a lineman apprentice. (Gurner Depo. at 73). So, Prestridge had learned many of the skills required of lineman apprentices. (Kelly Depo., Exhibit 5). Gurner's position, that he hired Prestridge due to superior qualifications, (Gurner Depo. at 72), is supported by the evidence in the record.

Since defendants have satisfied their burden to produce a legitimate, nondiscriminatory reason for refusing to hire plaintiff, the burden shifts back to plaintiff to show that the proffered reason was pretextual, and that the action was motivated, at least in part, by discrimination. *See* 42 U.S.C. § 2000e–2(m). In examining plaintiff's evidence of pretext, the Court reiterates that it must draw all reasonable inferences and resolve all reasonable doubts in favor of plaintiff.

Plaintiff advances three arguments supporting his position that defendants' proffered explanation is pretextual. First, he argues that he was qualified for the position. Second, he reiterates the evidence of Gurner's discriminatory attitude, discussed in detail *supra*. Third, he presents statistical evidence regarding defendants' hiring practices. The Court examines each argument in turn.

In resolving the first step of the *McDonnell Douglas* inquiry, the Court assumed (with some reservations) that plaintiff was minimally qualified for the lineman apprentice position. However, plaintiff's qualifications were not so great that defendants' refusal to hire him can be labeled pretextual on that basis alone. As noted above, the three individuals who were hired for the positions seemed to be more qualified than plaintiff in every way—all three scored higher on the City's written test (76–96% as opposed to plaintiff's 53%), and all three had experience doing work similar to that required of lineman apprentices. Even if plaintiff were minimally qualified for the position, no reasonable jury could infer from the evidence in the record that defendants' hiring of more qualified applicants supported an inference of pretext or discrimination.

The second argument plaintiff makes is that the testimony regarding Gurner's telling of racial jokes and using the "N" word, coupled with Gurner's refusal to shake plaintiff's hand, can support an inference of discrimination. (Gurner Depo. at 100–01; Allen Depo. at 83–84). The Court disagrees. As noted in the discussion of whether this evidence qualifies as direct evidence, all of the evidence offered by plaintiff on this point is highly equivocal and unrelated to the decision he challenges. Even under the relaxed standard of causation established by § 2000e–2(m), a plaintiff still has the burden to show that the employer had a discriminatory intent *and* that the intent was a "motivating factor" in the challenged decision. Conceivably, some of the evidence presented by plaintiff could permit an imaginative jury to infer that Gurner harbored racially discriminatory attitudes, but plaintiff has offered no evidence tending to show that those

attitudes were a "motivating factor" in Gurner's decision not to hire him. To the contrary, the evidence about Gurner's use of the "N" word and recital of racial jokes concerned huge periods of time, and the evidence in the record does not even suggest that Gurner's remarks were made at or concerning work. Because there is no evidence in the record to even hint at a connection between these remarks and the decisions not to hire plaintiff, the Court must conclude that plaintiff cannot rely on this evidence to show that race was a "motivating factor" in the challenged decision.[14]

The final piece of evidence plaintiff relies upon to show pretext is the hiring figures for the City and the Electrical Department. Plaintiff asserts that, of 283 City employees, only 45 are black; of 40 Electrical Department employees, only four are black. (Kelly Depo., Vol. I, at 64, 79; Gurner Depo. at 95). Even if these figures are true, they are of no probative value whatsoever without the proper statistical foundation. In order for these statistics to be probative, plaintiff would have to provide *comparative* statistics that showed the success rates of *similarly qualified* black and white applicants. *See Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir.1994). Absent such a comparison, the statistics offered by plaintiff cannot support any inference.

In short, none of the evidence offered by plaintiff could allow a reasonable jury to find a discriminatory animus that was a "motivating factor" in defendants' decision not to hire plaintiff. Plaintiff has failed to present substantial evidence of pretext, and so defendants are entitled to judgment as a matter of law. Therefore, defendants' motion for summary judgment is due to be granted, and a separate Order in accordance with this Memorandum of Decision will be entered.

---

**14.** Gurner's reference to Carlos Kennemer as "the black guy" fails to support an inference of discriminatory intent. As the Court noted *supra,* the context of Gurner's statement showed that the reference was merely for identification, not as a derogatory statement. And, the evidence of the hand-shaking incident similarly fails to show discriminatory intent. Gurner's refusal to shake plaintiff's hand is not sufficiently probative of discrimination. Plaintiff's testimony was that he interpreted Gurner's action as evidence of a sentiment of "there you are again, Mr. Allen." (Allen Depo. at 84). The only reasonable inference to be drawn from this testimony is that Gurner was tired of considering plaintiff, because he thought that plaintiff was unqualified for the position. The evidence is simply too ambiguous to create an issue of fact on the issue of Gurner's intent. Gurner's testimony about hiring one black and one female applicant in order to forestall discrimination lawsuits, (Gurner Depo. at 32–33, 38–39), is neither probative of discriminatory intent nor related to the decision not to hire plaintiff.